**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 13 CR 772-3** |
| | ) | |
| **v.** | ) | **Judge Bucklo** |
| | ) | |
| **JULIAN MARTIN,** | ) | **Magistrate Judge Cole** |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**REGARDING EVIDENCE OBTAINED DURING TRAFFIC STOP**

**INTRODUCTION**

Julian Martin seeks to suppress evidence obtained during what he insists was an illegal search and seizure on July 5, 2011. On that day, Chicago Police officers stopped Mr. Martin's Cadillac for what they claim was a failure to signal a lane change. It is the government's contention that as they curbed Mr. Martin's car, he, while seated in the car, made a furtive motion towards his waist, instead of immediately raising his hands as he and his passengers were ordered to do. The officers then immediately pulled him out of the car at gunpoint and ordered him to lie on the ground and proceeded to search him. The search revealed two pistols in a plastic bag tucked into the waistband of his pants. One of the guns was one quite large and would have made a visible outline under Mr. Martin's shirt. The other gun was much smaller and was found at the bottom of the bag. Mr. Martin, a twice-convicted felon, has been indicted for possession of the firearms in violation of 18 U.S.C. §922(g)(1).

Mr. Martin contends that he did not commit any traffic violation, and the police had no probable cause or reasonable suspicion even to stop him. He also contends that what occurred was

an illegal arrest followed by an illegal search and seizure, requiring suppression on the weapons. Judge Bucklo has referred this motion to me for a report and recommendation. *See Peretz v. United States*, 501 U.S. 923, 937 (1991).

### A.

While the government contends that there was a traffic violation, which, standing alone, warranted the stop of Mr. Martin's car and the ensuing discovery of the weapons, according to the government, quite a bit more than a mere failure to signal occurred. The police knew, for example, that Mr. Martin was a twice-convicted felon and was a high-ranking member of the Imperial Insane Vice Lords, a notorious Chicago street gang. Court-authorized wiretapping of an even higher ranking member, Nathaniel Hopkins, led the police to conclude that Mr. Martin was transporting contraband on the day they stopped his car. In an intercepted call on April 12, 2011, Hopkins and Martin discussed making changes to the Vice Lords organization and leadership. Calls intercepted over additional target phones on June 17, 2011 – Target Phones 2 and 3 – provided additional evidence of Mr. Martin's involvement in criminal activity in his role as a member of the Vice Lords. And, during surveillance, Mr. Martin was observed at one of the Vice Lords' drug markets on numerous occasions.

On July 5, 2011, at approximately 3:14 p.m., investigators intercepted a call from J.L. to Mr. Martin, in which J.L. told Mr. Martin that "Bo Diddley" – known to investigators as J.W., a high-ranking member of another Vice Lords faction – was looking for Mr. Martin. Mr. Martin asked J.L. to text him J.W.'s number. After J.W. did so, Mr. Martin called the number and spoke to J.W., who asked to meet. At 7:18 p.m., in another call, Mr. Martin said that he was on his way to J.W., and J.W. told Mr. Martin to meet him at "Fats'."

About a half-hour later, investigators observed Mr. Martin park his car and leave it in the vicinity of Fats' residence. About twenty minutes after that, J.W. used Mr. Martin's phone to place a call to an unknown woman, telling her that Mr. Martin was coming to the house and cryptically instructed her to give Mr. Martin "both of them." J.W. explained that "both of them" were under the mattress. The woman agreed.

In another call at approximately 8:14 p.m., Mr. Martin told an unknown man that he would have "something" for the man to keep. The man, apparently understanding the coded references, asked no questions, said that he would put "them" in his drawer. Next, investigators observed Mr. Martin with two other men, including co-defendant, Torrie King, on foot in the area of J.W.'s residence just prior to that call. Mr. Martin then phoned the woman J.W. had spoken with earlier that day and told her he was at the door. Just after the call, investigators observed Mr. Martin return to his car.

Based on the intercepted phone calls and surveillance, investigators could reasonably conclude that Mr. Martin had obtained narcotics or firearms (or some other form of contraband) from J.W.'s residence. Office Marquez, an officer with 28 years on the Chicago Police force, testified that the references in the wiretaps were code words for some sort of contraband. This conclusion was based on the fact that the parties had been involved in illegal activity and that the words used by the participants to the call (i.e. "put something up") in his experience meant hide. *See United States v. Garrett*, 757 F.3d 560 (7th Cir. 2014); *United States v. Dooley,* 2013 WL 2548969, 21 (N.D.Ga. 2013)(a judge may consider an agent's interpretation of code words and language in determining whether probable cause exists). The content and circumstances of the conversations in this case reasonably supported the officers' interpretations of the calls.

The Chicago Police officers who stopped Mr. Martin's car testified that they did so because he made a lane change without first signaling. They said that Mr. Martin did not at first obey their instruction to raise his hands when they stopped the car, but instead made a furtive movement toward his waist which was below their line of sight.[1] Mr. Martin was ordered out of the car. The officers testified that they saw a bulge in Mr. Martin's waistband and that during the ensuing pat down, they felt what appeared to be the butt of a gun. Ultimately, the officers secured two guns in a plastic bag from Mr. Martin's waistband. Officer Evangelites said that he first patted down Mr. Martin, found the guns, and then arrested him.

Mr. Martin and his witness, Mr. Shotwell, admittedly his best friend, told a very different story. Both were absolutely certain that Mr. Martin had not made any lane change that day without first signaling. In fact, Mr. Martin said that he had made plenty of lane changes earlier in the day but that each one was preceded by an appropriate signal. Mr. Martin also denied making any furtive movement toward his waistband, and Mr. Shotwell said he saw no such movement. Mr. Martin said an officer ordered him out of the car at gunpoint, forced him to the ground and then searched him. In his rendition of things, he was searched and then arrested.

Apart from this sharp conflict in the testimony, it appears to be undisputed that the officers then transported Mr. Martin to a police station where, after being given, and waiving, his *Miranda* rights, Mr. Martin explained that he had just gotten the guns five minutes before he was pulled over from a man he knew as "Ant." Mr. Martin told the officers that he was going to "put up" the guns,

---

[1] The arrest report did not reflect the claimed movement by Mr. Martin.

or hide them, "just in case for security." Mr. Martin added that he had paid $400 for the guns.[2]

**B.**

At bottom then, the government's position is that there were two independent bases on which to justify the police behavior – the first being the information obtained from the wiretaps, which, the government contends, provided probable cause to believe that Mr. Martin had either guns or narcotics or other contraband in the car. The argument is essentially based on the secretive way in which the telephone participants spoke and the fact that the subject matter of the conversation was to be moved and hidden. There is a good deal of force to the argument, and at a minimum, it certainly warranted the police in following Mr. Martin. Of course, the officers' admitted hope that if Mr. Martin committed a traffic violation they would stop him and hopefully find contraband on his person or in the car does not invalidate an otherwise lawful stop and ensuing seizure. *See Whren v. United States*, 517 U.S. 806 (1996); *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008)("'[P]olice officers] may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.'").

The second and alternative prong of the argument is that Mr. Martin actually committed a traffic violation and that the officers under the precise factual circumstances of the case, as explained at the evidentiary hearing, permitted them to stop Mr. Martin's car, pat him down and seize the weapons and arrest him.[3]

---

[2] The Government makes no claim that the *Miranda* warnings were enough to dissipate the alleged taint.

[3] In a companion Report and Recommendation, it was recommended that the motion to suppress the
(continued...)

**ANALYSIS**

**1**.

Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), "police officers may conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir.2003). "Reasonable suspicion" means "'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *Johnson*, 337 F.3d at 542. Although police may not detain a suspect based merely on a "hunch," under *Terry* and its progeny "the likelihood of criminal activity *need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard*." *United States v. Arvizu*, 534 U.S. 266, 274 (2002)(Emphasis supplied). When evaluating the reasonableness of a stop, courts must examine the totality of the circumstances known to the officer at the time the stop is made. *Johnson*, 337 F.3d at 542-43; *United States v. Jackson*, 300 F.3d 740, 745–46 (7th Cir. 2002).

When a vehicle is the subject of a *Terry* stop, proximity of the vehicle to the suspected criminal activity and the proximity in time to the crime are two important factors to be considered in determining reasonable suspicion. *Johnson*, 337 F.3d at 543. In this case, the intercepted phone conversations leading up to the traffic stop were "sufficient to raise at least a reasonable suspicion—if not probable cause—that crime was afoot, which was all that was necessary for the officers to stop [Mr. Martin] to investigate." *United States v. Garrett*, 757 F.3d 560, 567 (7th Cir.

---

³(...continued)
wiretap evidence and its fruits – which would necessarily include the guns found on Mar. Martin since without the tapes, they never would have followed him and thus would never have seen the unsignaled lane change.

2014); *United States v. Johnson*, 383 F.3d 538, 543 (7ᵗʰ Cir. 2004).

In *Garrett*, for example, the law enforcement officials testified regarding their involvement in the wiretap operation and their observance of illicit activities. Intercepted calls between the defendant and another individual "suggest[ed] a drug transaction was underway . . . ." Officers then witnessed the defendant receive a plastic bag from a man who entered and exited the car in a pizza place's parking lot. This transaction occurred minutes after defendant told the other individual he was "ready for him," and was immediately followed by a phone call to be sure that the defendant was satisfied with the transaction. This, the Seventh Circuit concluded, was adequate to establish probable cause or, at the very least, reasonable suspicion that a crime had occurred. 757 F.3d at 567 (7ᵗʰ Cir. 2014).

So too here. The intercepted phone calls and surveillance observations of Mr. Martin's activity created at least reasonable suspicion that he was transporting either guns, drugs, or other contraband. If guns, that was a singularly serious matter since Mr. Martin was a twice-convicted felon. Law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and expertise. *United States v. Parra*, 402 F.3d 752, 765 (7ᵗʰ Cir. 2005); *United States v. Funches*, 327 F.3d 582, 586 (7ᵗʰ Cir. 2003). That's just what the police did here. Acceptance of the defendant's argument would have required the police to take an ostrich-like approach to the obvious implications of the information that they had before them.

## 2.

The Supreme Court has held that officers can order a driver out of a vehicle for any lawful traffic stop because of the "inordinate risk confronting an officer as he approaches a person seated in an automobile." *Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *Pennsylvania v. Mimms*, 434 U.S.

106, 110 (1977); *see also United States v. Davis*, 418 Fed.Appx. 556, 558 (7ᵗʰ Cir. 2011)("... when the turn signal occurred the officers had probable cause to pull the car over and order the passengers out for the duration of the stop.").

If the officer has a reasonable suspicion that the driver is armed or may be able to gain immediate control of a weapon, he may conduct a pat down search of the driver, *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir.2007), and a search of the passenger compartment for any accessible weapons. *Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983). In assessing the reasonableness of police action, the court balances the degree of intrusion against the government's justification for the search. *See United States v. Knights*, 534 U.S. 112, 118–119 (2001).

Here, according to the officers' testimony at the hearing, Mr. Martin moved furtively inside his vehicle at the time of the stop and did not immediately comply with their order to raise his hands. Indeed, according to them, he dropped his hands below their line of sight by his waist, where, of course, he could have had a gun. Or, he could have had a gun on the seat of the car or on his lap. The officers testified that they noticed a bulge protruding from his waistband. The pat down revealed the two handguns. *See Mimms*, 434 U.S. at 112 ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'"); *Machado v. Weare Police Dept.* 494 Fed.Appx. 102, 106 (1ˢᵗ Cir. 2012)(search justified by bulge near waistband); *United States v. Stennis*, 457 Fed.Appx. 494, 499 (6ᵗʰ Cir. 2012)(same); *United States v. Brissey*, 520 Fed.Appx. 481, 484 (7ᵗʰ Cir. 2013)(search justified when defendant made furtive movement inside vehicle, reaching for unidentified object); *United States v. Schlatter,* 411 Fed.Appx. 896, 899 (7ᵗʰ Cir. 2011)(search justified where defendant "was moving around

suspiciously in the driver's seat, leaning across and making motions that were reasonably consistent with hiding contraband or retrieving a weapon."); *United States v. Patton*, 705 F.3d 734, 740 (7ᵗʰ Cir. 2013)("A display of nervousness is frequently recognized as a sign that a suspect has something to hide, including a weapon.").[4]

And, of course, the officers' assessment of the situation and the potential risk to their own safety quite properly took into account the knowledge they had obtained from the wiretap investigation and surveillance showing that Mr. Martin was involved in the drug trade. Participation of a suspect in drug trafficking creates a reasonable suspicion that he may be armed, owing to the violent nature of the enterprise. *See United States v. Kenerson*, 585 F.3d 389, 392 (7ᵗʰ Cir. 2009).

### 3.

Mr. Shotwell and Mr. Martin claimed to have a perfect recall of the traffic stop and of the events preceding it. Mr. Shotwell, Mr. Martin's admittedly closest friend, and Mr. Martin each denied there had been any traffic violation, although they conceded that the incident had occurred three year ago. But memory is fallible and fades with time, even of events only two weeks in the

---

[4] It is apparent that the discovery of the weapons was inevitable, whether or not Mr. Martin made a furtive movement causing the officers to react as they did. Given what the officers knew they would certainly have ordered Mr. Martin out of the car once he had committed the traffic and they then would have observed the bulge in his waistband. A pat down would have inevitably followed with the retrieval of the weapons. All of that would be consistent with Fourth Amendment requirements and restrictions. The inevitable discovery doctrine permits the government to introduce evidence seized in of the Fourth Amendment "if the Government can prove, by a preponderance of the evidence, that the officers' ultimately or inevitably would have discovered [the challenged evidence] by lawful means." *United States v. Marrocco,* 578 F.3d 627, 637 (7th Cir.2009), quoting *Nix v. Williams,* 467 U.S. 431, 444 (1984). To meet this burden, the government must demonstrate both that "it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence" and (2) "that it would have conducted a lawful search absent the challenged conduct." *Id.* at 637–38. Both requirements are met in this case. *See generally* the discussion in *United States v. Howard,* 729 F.3d 655, 663 (7ᵗʰ Cir. 2013).

past. *Lynch, Inc. v. SamataMason Inc.*, 279 F.3d 487, 490-491 (7th Cir.2002); *Dickey v. Florida*, 398 U.S. 30, 42 (1970)(Brennan, J., concurring). And the fact that a witness claims to have a vivid recall of something does not ensure the accuracy of the memory. *See United States v. Bartlett,* 567 F.3d 901 (7th Cir.2009); *Kadia v. Gonzales,* 501 F.3d 817, 821 (7th Cir.2007). *See also* Holmes, *Natural Law,* 32 Harv. L.Rev. 40, 41 (1918)("certitude is not the test of certainty.").

Neither Mr. Shotwell nor Mr. Martin offered any reason why they could or should have recalled an instant in time three years ago. Perhaps, had Mr. Martin claimed that he was driving cautiously because he was carrying guns in his waistband and was concerned about being stopped, their testimony would have been more plausible. But neither said that. And it is implausible to believe that a twice-convicted felon involved in narcotics activities and a high ranking member of a notorious Chicago street gang would have been so concerned about obedience to traffic laws that took pains not to change lanes without first signaling.[5]

As for Mr. Shotwell, he was in the back seat and never attempted to explain how he could have seen whether Mr. Martin signaled or did not or why he would have paid any attention one way or the other. Like Mr. Martin, Mr. Shotwell never claimed that they were being especially careful because they had contraband in the car. Add to that the ties of close friendship he had with Mr. Martin and his testimony becomes even less credible. By contrast, the police had every motive to pay the closest attention to Mr. Martin's driving that day and every motive to remember what occurred.

In gauging the truth of conflicting evidence, the trier of fact "has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity." *Weiler v. United States,* 323 U.S. 606, 608 (1945).

_____

[5] Those convictions bear on credibility. See Rule 609, Federal Rules of Evidence.

To separate truth from a tale spun for the occasion, one looks to the implausibility of testimony, the shifting and vacillating explanations for conduct, uncertain and inconsistent memories, the inconsistencies between testimony and objective evidence, the internal inconsistencies within testimony, and the extent to which documents or objective evidence may contradict the witness' story. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574-75 (1985); *Mitondo v. Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008); *United States v. Bradford,* 499 F.3d 910, 920-21 (8th Cir.2007); *Kadia v. Gonzales,* 501 F.3d 817, 820 (7th Cir.2007); *Pinpoint, Inc. v. Amazon.Com, Inc.,* 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.)(sitting by designation). And of course, one must not forget, witnesses will lie when it is to their advantage. *Schmude v. Tricam Industries, Inc.*, 556 F.3d 624, 628 (7th Cir. 2009). [6]

---

[6] Demeanor can also play an important role in assessing credibility. *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). But it is often an overrated and imprecise tool. *See United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998)(Posner, C.J.)("Judges fool themselves if they think they can infer sincerity from rhetoric and demeanor" and 'weepy' performances.");*Mitondo v. Mukasey* 523 F.3d 784, 788 -789 (7th Cir.2008) (Easterbrook, J.)("The belief that many people form from watching television and movies-that this can be done by careful attention to a witness's demeanor-has been tested and rejected by social scientists. Looking for mannerisms, hesitations, and perspiration is the method of the lie detector without the polygraph machine. ... In other words, if you want to find a liar you should close your eyes and pay attention to *what* is said, not *how* it is said or what the witness looks like while saying it.")(emphasis in original). In this case, there was nothing in the witnesses' demeanor that was unusual or revealing..

Applying these factors, I find the testimony of the Chicago Police officers regarding the reason for the traffic stop and what ensued thereafter credible, and that of Mr. Shotwell and Mr. Martin not credible. Accordingly, I recommend that the motion to suppress [462] be denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/10/14

Specific, written objections to the Report and Recommendation must be filed with the Clerk of the District Court for the Northern District of Illinois, 219 S. Dearborn, 20th Floor, Chicago, IL 60604, within fourteen (14) days of being served with a copy of the Report and Recommendation. Failure to file specific, written objections within the specified time waives the right to appeal this Report and Recommendation. *See* Fed.R.Civ.P. 72(b)(2); 28 U.S.C. 636(b)(1)(C); *United States v. Brown*, 79 F.3d 1499, 1504, n. 4 (7th Cir. 1996); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 329 (7th Cir.1995); *Video View, Inc. v. Studio 21 Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).