IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-CR-772-3 |
| | ) | Judge Elaine E. Bucklo |
| | ) | |
| JULIAN MARTIN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT MARTIN'S SUPPLEMENT TO HIS COMBINED MOTION FOR A NEW TRIAL AND MOTION FOR A JUDGMENT OF ACQUITTAL AND MEMORANDUM OF LAW IN SUPPORT

NOW COMES the Defendant, JULIAN MARTIN, by and through his attorneys, Damon M. Cheronis and Ian M. Barney, and now requests that, pursuant to *Brady v. Maryland* and its progeny, as well as Rule 16 of the Federal Rules of Criminal Procedure, this Honorable Court vacate Martin's guilty verdicts, grant him a new trial, and re-open briefing on Martin's Motion to Suppress Title III Evidence. In support thereof, he states the following:

### INTRODUCTION

On September 26, 2013, Julian Martin was charged along with twenty-three others in a far-reaching indictment centered around the alleged criminal enterprise the Imperial Insane Vice Lords. (Dkt. 863). On December 9, 2014, the original indictment was superseded. (Dkt. 3242). In the superseding indictment, Martin was charged with racketeering (count 1), accessory after the fact to murder (count 6), conspiracy to commit murder (count 7), possession of a firearm in relation to a crime

of violence (count 8), distributing a controlled substance (count 9), and unlawful possession of firearms (count 22). On July 7, 2015, after a bench trial, this Court entered findings of guilty on Counts 1, 6, 9, and 22.

Martin subsequently filed a Combined Motion for a New Trial and Motion for Judgment of Acquittal pursuant to Federal Rules of Criminal Procedure 29(c) and 33. (Dkt. 1197) The Court has yet to rule on that motion. Martin now herein supplements that motion.

## I. Background

As this Court well knows, the government's case centered around the self-styled "enterprise" the Imperial Insane Vice Lords ("IIVL"). According to the superseding indictment, the IIVL was a criminal organization whose members, functioning as a unit, engaged in acts of violence and the distribution of controlled substances. (Dkt. 3242 at ¶1 & 2). The organization was described in the indictment as a hierarchy, wherein the "King" was the highest rank, followed by "Don," "Prince," and "Universal Elite." (Dkt. 3242 at ¶3(a)). In summary, the alleged primary purpose of the IIVL was enriching members of the IIVL through the distribution of controlled substances at open air drug markets located in the City of Chicago, including at the intersection of Thomas Street and Keystone Avenue. (Dkt. 3242 at ¶¶3(d) & 4).

The superseding indictment further alleged that, beginning no later than 1996 and continuing to September of 2013, Hoskins, Faulkner, Martin, King, Myles, and others, were members of the IIVL enterprise. (Dkt. 3249 at ¶6). Further, at

relevant times, Nathaniel Hoskins was the King of the IIVL, Joseph Faulkner was the Prince, and Martin was a Five Star Universal Elite. Dkt. 3249 at ¶¶5(a)-(c)). At trial, Martin was also purported to be the Prince of the IIVL for a period of time in 2011.

## II. Martin's Motion to Suppress Title III Wire Taps

Prior to trial, Martin made a motion to suppress phone calls intercepted pursuant to a Title III order. In that motion, Martin asserted that suppression was mandated by 18 U.S.C. § 2518(10)(a) because the government failed to make a full and complete statement as to whether other investigative procedures had been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous. (Dkt. 587 at 3-4). In addition, Martin argued that there were material omissions in the affidavit in support of the order such that the intercepted phone calls should be suppressed pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (Dkt. 587 at 20).

In support of his motion, Martin pointed to a laundry list of information that was curiously omitted from the Title III affidavits. In short, the main thrust of Martin's argument was that if the omitted information was included in the affidavit, the magistrate would have concluded that the Title III order was unnecessary because the investigation into the IIVL was, actually, going quite well. There were numerous cooperating sources who were providing very valuable information on an ongoing basis. Indeed, the government had cooperating sources at the highest levels of the gang. (Dkt. 587 at 23). In the affidavit, however, the

government alleged that it had exhausted all traditional investigative techniques, that infiltrating the gang was not feasible, and that confidential sources were unlikely to be successful in achieving the goals of the investigation. (April 29, 2011 Aff'd. at ¶¶32 & 33).

Martin's motion was denied by Magistrate Judge Cole and his ruling was subsequently upheld by this Court.

### III. Trial

Martin elected to proceed to a bench trial before this Court. Martin will not belabor the evidence presented at trial, but does point out that he maintained that the government had failed to prove that the Imperial Insane Vice Lords constituted an "enterprise" for purposes of racketeering. Martin argued for acquittal on Count 1 on that basis. The gist of his argument was that the IIVL organization was more aptly characterized as a loose affiliation of individuals who were driven by self-interest, not gang loyalty.

The government also presented evidence at trial regarding the attempted murder of Tony Carr, who was a purported marijuana dealer in the area of Division and Pulaski. The evidence was offered to prove Martin's association with the enterprise. Raymond Myles, a cooperating witness, testified that Martin ordered him to kill Carr, but, when he went to shoot Carr in the head, the gun jammed. Myles testified that he then pistol whipped Carr and ran away. Though the Court has not specifically found Martin responsible for that conduct, the government has included it in its version of the offense that was submitted to probation for

sentencing. Martin presumes that the government will, at the very least, argue that the Court should take this alleged conduct into account under Section 3553(a).

## IV. Newly Disclosed Material

Through discovery, as well as testimony at trial, Martin learned that prior to Hoskins taking the reins as King of the IIVL, the organization was "led" by a man who went by D.J. According to testimony from Charles Vaughn, given at the trial of Deshaun Brown, Kyle Pagan, and Gregory Hawthorn, D.J. was the King of the IIVL from the 1980s up until his death in late 2010 or early 2011. (Vaughan at 63, 98). Vaughan's testimony is corroborated by Darrell Pitts, who testified at the trial of Hoskins, Martin, and King. (Pitts at 93-95). According to Vaughan, after D.J. died Hoskins became the "self-proclaimed" King of the IIVL. (Vaughan at 78).

Through the disclosure of approximately 500 pages of DEA reports, counsel for Martin has now learned that during the period of time that D.J. was the "King" of the IIVL, he was also a confidential government informant who provided the DEA with constant information about the IIVL "enterprise" for over half a decade. According to the documents provided to counsel, D.J. began cooperating in June of 2004 and continued cooperating until at least January 19, 2010. It is unclear whether the last report in the batch of documents is, in fact, the last meeting between the DEA and D.J., as there is no report noting that he ceased cooperating. [1]

---

[1] Additionally, the nature of this initial debriefing and subsequent contacts between D.J. and the DEA indicate that D.J. had been cooperating prior to the June 14 meeting. There is no traditional initial vetting and "debriefing" in the documents and D.J. begins conducting controlled buys while wearing a recording device literally the day after his "initial" debrief.

D.J.'s cooperation was extensive in every sense of the word. He provided background information regarding the IIVL and the drug organization; the names and contact information of high-ranking members of the enterprise; identified high-volume drug dealers; made recorded phone calls; conducted controlled buys with high-ranking IIVL members; wore a recording device to high-level IIVL meetings; and provided information regarding murders and other acts of violence committed by IIVL members. The DEA was able to obtain warrants on more than one occasions based, at least in part, on information provided by D.J. In short, he was the "golden goose" of confidential informants. Astonishingly, he did this for nearly six years. While counsel strenuously believes that the Court should conduct an *in camera* inspection of all of the materials in order to resolve this motion, he will highlight some of the significant cooperation offered by D.J.[2]:



---

[2] The reports provided to counsel are in chronological order. Every report is not, however, in order by bate stamp number. For that reason, counsel will refer to the report by date rather than bate stamp number.







## LEGAL FRAMEWORK

Federal Rule of Criminal Procedure 16 and Title 18 U.S.C. § 3500 generally govern discovery in criminal cases. The discovery process, however, is undergirded by fundamental principles of due process. *See Kyles v. Whitley*, 415 U.S. 419, 432-45 (1995). "The prosecution's affirmative duty to disclose favorable evidence to a

---

[3] Given the location of the conversation (Cicero and Huron), Martin presumes that "Julian" is in fact Julian Martin.

defendant can trace its origins to early 20th-century strictures against

misrepresentation and is of course most prominently associated with this Court's

decision in *Brady v. Maryland . . .*" *Id.* at 432. In *Brady v. Maryland,* the Supreme

Court held that suppression of evidence favorable to the accused by the prosecution

violates a defendant's due process rights if that evidence is material to either guilt

or punishment. *Brady v. Maryland,* 83 S.Ct. 1194, 1196-97. This is the case

regardless of good faith or bad faith on the part of the prosecution. *Id.*

      Over 20 years later, in *United States v. Bagley,* 105 S.Ct. 3375 (1985), the

Supreme Court extended the rule announced in *Brady* to apply to situations where

the prosecution fails to disclose evidence that the defense might have used to

impeach government witnesses. "Impeachment evidence, however, as well as

exculpatory evidence, falls within the *Brady* rule." *Bagley,* 105 S.Ct. at 3380. The

rule in *Bagley* was, of course, a closely related extension of the rule announced in

*Giglio v. United States,* 405 U.S. 150, 154 (1972) (failure to disclose promises of

leniency made to a government witness constitutes a violation of due process). The

opinion in *Bagley,* however, also set forth a new rubric for analyzing whether a

failure to disclose certain material amounted to a constitutional violation. In short,

the information that was not disclosed must be "material" to the defense. *Bagley,*

105 S.Ct. at 681-82. Evidence is material if there is a reasonable probability that

the result of the proceeding would have been different had the evidence been

disclosed. *Id.* at 682.

A showing of materiality does not require demonstration that disclosure of the suppressed evidence would have ultimately resulted in the defendant's acquittal. *Whitley,* 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial . . ." *Id.* In *Whitley,* the Court pointed out that a defendant need not establish that there would not have been enough to convict him taking the new evidence into consideration. *Id.* at 435. Rather, a defendant need only show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* In short, to establish a *Brady* violation and win a new trial, a defendant must establish that the evidence is favorable, that it was suppressed, and that it is material.[4]

Importantly, whether the prosecutor had actual knowledge of the undisclosed material is irrelevant to the analysis. Prosecutors have an obligation to learn of evidence favorable to the accused that is known to others acting on the government's behalf, including police investigators. *Id.* at 438; *Stickler v. Greene,* 119 S.Ct. 1936 at 1948 ("Moreover, the rule encompasses evidence 'known only to the police investigators and not to the prosecutor.'").

Several circuit courts have recognized the importance of the admonitions outlined above and have suggested that these fundamental principles of due process

---

[4] Evidence is favorable if it is exculpatory or impeaching, and evidence in the government's possession that is not disclosed is "suppressed" for *Brady* purposes. *See Bagley,* 105 S.Ct. at 3379-80.

apply in the context of pre-trial suppression hearings. The Ninth Circuit has held as much explicitly, and the Fifth, Tenth, and Fourth Circuits have so. *United States v. Barton*, 995 F.2d 931 (9th Cir. 1993) (holding that *Brady* applies to suppression hearings); *United States v. Johnson*, 117 F.3d 1429 (10th Cir. 1997) (*unpub.*) (applying *Brady* and *Bagley* to examine whether the outcome of the suppression hearing would have been different had favorable evidence been disclosed); *United States v. Williams*, 10 F.3d 1070 (4th Cir. 1993) (assuming *arguendo* that *Brady* applies to suppression hearings, but declining to address the issue definitively because the claim before the court was without merit); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990) ("The appropriate assessment for *Brady* purposes, of course, is whether nondisclosure affected the outcome of the suppression hearing.").

In *United States v. Barton*, 995 F.2d 932, 935 (9th Cir. 1993), Ninth Circuit explicitly adopted the rule that *Brady* applies to pre-trial suppression hearings. The court's reasoning is particularly persuasive. There, physical evidence was destroyed prior to a suppression hearing, thereby preventing the defendant from utilizing the evidence to impeach material parts of a search warrant affidavit. *Barton*, 995 F.2d at 934-35. In considering the due process principles outlined in *Brady* and its progeny, the court noted that the Supreme Court has previously held that the Fourth Amendment's probable cause requirement would be eviscerated if police could mislead a magistrate to obtain a search warrant, and a defendant was not permitted later to challenge those allegations. *Id.* The court reasoned that the same rationale applied when impeaching evidence is destroyed:

> By deliberately destroying impeaching evidence, an officer could feel secure that false allegations in his or her affidavit for a search warrant could not be challenged. Such a result would effectively deprive a criminal defendant of his Fourth Amendment right to challenge the validity of a search warrant. To protect the right of privacy, we hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for search warrant.

The court ultimately concluded that there was no *Brady* violation because the outcome of the suppression hearing would not have been different. *Id.*

The Seventh Circuit has been careful to not stake out a definitive position on the issue, but at least one of its opinions suggests that the *Brady* principles may apply. *See United States v. Veras*, 51 F.3d 1365 (7th Cir. 1995); *see also United States v. Stott*, 245 F.3d 890 (7th Cir. 2001). In *United States v. Veras*, 51 F.3d at 1374-76, the Seventh Circuit indirectly addressed the issue. There, the court adopted the district court's findings that suppression of a piece of impeaching evidence would not have affected the outcome of the suppression hearing or the trial. The Seventh Circuit stated, "We find the district court's analysis under *Dimas* could not be more correctly stated . . . The district court stated: 'Given Gracias's denial of each and every allegation at the hearing, the court would not have changed its ruling denying the motion to suppress. The outcome of the trial would also have not been affected.'" *Id.* at 1375.

Martin acknowledges that a later Seventh Circuit opinion determined that *Veras* did not hold that *Brady* applied to pre-trial suppression hearings. *Stott*, 245 F.3d at 901 ("Given the context in which this statement arose, we cannot conclude

that it squarely establishes that *Brady* applies to suppression hearings"). The court in *Stott* further noted, "[W]e have not had an opportunity to focus definitively on this issue." *Id.*

Nevertheless, based on the persuasive reasoning in *Barton* and the application of *Brady* to pre-trial suppression hearings by other circuits, Martin now asks this Court to apply the standards enunciated in *Brady* and its progeny to impeachment evidence not disclosed prior to his pre-trial suppression motion. Though the Seventh Circuit has not explicitly adopted this approach, it has also not foreclosed it.

## ARGUMENT

Martin now argues that a *Brady* violation occurred and he is entitled to a new trial because the newly disclosed evidence: (1) was exculpatory in that it tended to disprove the existence of the enterprise and Martin's association with it; and (2) was impeaching with respect to the Title III affidavits because it tended to prove that traditional investigatory techniques were perfectly viable.

### I. Motion to Suppress

With regard to Martin's motion to suppress, the documents related to D.J.'s cooperation were both favorable and material. As set out in the original motion, the keystone to the government's necessity argument was that other investigative techniques had been tried and failed, or would be ineffectual or dangerous. The government specifically alleged that a cooperating source would not be useful in achieving the goals of the investigation. Martin called these statements into

question in his original motion to suppress by pointing to the numerous cooperating sources that helped the DEA gain valuable information about the alleged IIVL drug network, the members of IIVL, and other crimes supposedly committed on behalf of IIVL. The statements in the law enforcement affidavit are called even further into question by the newly disclosed material.

For one, the fact that the DEA was able to flip the "King" of the IIVL says something significant about the ability to infiltrate the gang. That the government *also* earned the cooperation of Joe Faulkner, possibly number two in the hierarchy, further supports this notion. Moreover, in terms of substance, the information provided by D.J. moving into 2010 was substantial. He had laid out much of the drug distribution network - who was controlling what area, what drugs were being sold, who the suppliers were, who was carrying firearms to defend drug spots. In short, the D.J. material seriously calls into question whether wiretaps were necessary to achieve the goals of the investigation.

Moreover, the government's failure to disclose to the magistrate the fact that the DEA had relied on the "King" of the IIVL for nearly six years as a cooperating source amounts to an omission made in reckless disregard for the truth, which materially affected the Title III affidavit. The main thrust of the affidavit was that Martin was a high-ranking leader of the IIVL, and that he helped control its drug distribution network. (April 29, 2011 Aff'd. at 12-17). Martin's position is that the D.J. material would have showed the magistrate that Martin was not, in fact, whom the government claimed he was.

To that end, the *only* time that Martin's name comes up in the D.J. reports is in a July 7, 2009 debriefing wherein D.J. reports a passing conversation with an individual he refers to as "Julian."[5] Julian apparently flagged D.J. down as D.J. was driving. D.J. reported to the DEA that Julian was one of Joe Faulkner's workers. There are no other references to Martin in the approximately 500 pages of reports - even despite that D.J.'s cooperation continued into 2010. Counsel acknowledges that the wiretap affidavit was submitted in early 2011, but, nevertheless, the fact that Martin was not even on D.J.'s radar moving into 2010 is relevant to the determination of whether he was one of the highest ranking members of the IIVL.

In short, the recently disclosed material is favorable to Martin in that it tends to impeach the wiretap affiant by negating the claim of necessity and supports Martin's *Franks* claim. Further, there is a reasonable probability that the result of Martin's motion to suppress would have been different if he would have had access to this discovery prior to trial. He is therefore asking this Court to vacate its findings of guilty and re-open briefing on the motion.

## II. Proving the Enterprise

The central part of the government's case was, of course, that the IIVL constituted an enterprise for purposes of RICO. To prove that Martin was a member of the enterprise, the government relied mainly on intercepted phone calls, the testimony of Darrell Pitts, and the alleged Tony Carr attempted murder. One of

---

[5] Martin cannot say with certainty that this statement references Julian Martin. He assumes it does, however, because of the name (Julian) and the fact that the conversation takes place in close proximity to Martin's home.

Martin's defenses was that the IIVL was not an enterprise because it lacked structure, the association was more akin to a loose collection of individuals, and there was no common purpose. He also denied involvement in the Carr incident.

To that end, the undisclosed documents are exculpatory in that they tend to support Martin's arguments on these points. For one, the purported King of the IIVL was, for the majority of the time-period covered by the indictment, a government informant. It also appears from the documents that, ironically, he was the lynchpin of whatever structure existed within the IIVL. Outside of him, every individual seemed to be out for him or herself. This was born out at trial and is supported by the newly disclosed material.

For example, the documents detail how Joe Faulkner, purportedly one of the highest ranking members in the so-called enterprise, robs, cheats, and steals from his fellow "members." At one point, he is not making enough money from his drug sales so he actually sticks up another IIVL member's drug spot. (Jan. 11, 2006). He also has another IIVL member shot over a dispute. (Feb. 18, 2005). Later, he makes a plan to rob the supplier of another IIVL member. (Aug. 19, 2009). Further, the entirety of D.J.'s cooperation makes clear that IIVL members were often at odds for various reasons. These are not the actions of a cohesive organization operating within a structure and towards a common purpose.

If Martin had access to this information prior to trial, he could have used it to support his theory that IIVL was not an enterprise for purposes of RICO. Further,

he believes there is a reasonable probability the outcome of the trial would have been different.

In addition, the newly disclosed reports contain information regarding Tony Carr, who testified with respect to being the victim of an alleged attempted murder. Specifically, the reports show that D.J. relayed to the DEA at some point in 2009 that Carr took charge of the Division and Pulaski narcotics operation for the 4 Corner Hustlers. (DEA 1/19/2010). The reports also detail the ongoing dispute between Faulkner and Carr. According to the reports, Faulkner wanted Carr's drug spot, so he had Carr shot. Carr's house was also burglarized.

This information would have been useful to Martin at trial. Interestingly, Carr testified that he was just a marijuana dealer, that he was not a member of a gang, and that he got along with most everyone (aside from Faulkner). The information gleaned from the D.J. reports would have allowed Martin to impeach Carr on those points. The information also could have been used to explore Faulkner and Carr's ongoing dispute over the drug spot and Division and Pulaski. Though Martin was aware, through discovery, that Faulkner was gunning for Carr, he was not aware that Carr was running a narcotics operation for the 4 Corner Hustlers. And, according to the D.J. documents, Faulkner - ever the entrepreneur - wanted to take that spot. The ongoing dispute would have given Faulkner ample

reason to attempt to kill Carr. Martin would have been able to better explore that avenue had he been in possession of the D.J. documents.[6]

## CONCLUSION

*Brady* and its progeny created important safeguards for a defendant's due process rights. A *Brady* claim turns on the cumulative effect of *all* evidence that was not disclosed. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). And the obligation to disclose remains on the prosecutor "regardless of any failure by the police to bring favorable evidence to the prosecutor's attention." *Id.* Ultimately, if the net effect is such that there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed, a *Brady* violation is established and a new trial should be granted.

Here, the undisclosed evidence is favorable to Martin in that it is both impeaching and exculpatory. The cumulative effect is that there now exists a reasonable probability that the result of Martin's motion to suppress and trial would have been different had the evidence been disclosed.

WHEREFORE, the Defendant, JULIAN MARTIN, respectfully requests that this Honorable Court vacate its findings of guilty, grant him a new trial, and re-open briefing on his motion to suppress wiretap evidence.

---

[6] While Martin submits the new Carr information in support of his request for a new trial, he also notes that the government is attempting to use the attempted murder of Carr at sentencing. In the event that Martin does not receive a new trial, the Court should prohibit the government from getting into the alleged incident involving Carr as a sanction for the discovery violation.

Respectfully submitted,

s/ *Damon M. Cheronis*
Attorney for Julian Martin

DAMON M. CHERONIS
Law Office of Damon M. Cheronis
53 W. Jackson Blvd., Suite 1750
Chicago, Il 60604
T: (312) 663-4644

## CERTIFICATE OF SERVICE

I, Damon M. Cheronis, hereby certify that on April 4, 2016, I electronically filed the foregoing **DEFENDANT MARTIN'S SUPPLEMENT TO HIS COMBINED MOTION FOR A NEW TRIAL AND MOTION FOR A JUDGMENT OF ACQUITTAL AND MEMORANDUM OF LAW IN SUPPORT** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Damon M. Cheronis
Damon M. Cheronis
Law Office of Damon M. Cheronis
53 W. Jackson Blvd., Suite 1750
Chicago, Illinois 60604